IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| KIMBERLY MARIA MYLES, | ) Case No. 4:21-cv-00158-SMR-HCA |
| Plaintiff, | ) |
| v. | ) ORDER ON DEFENDANT'S MOTION |
| | ) FOR SUMMARY JUDGMENT |
| WELLS FARGO BANK, N.A., | ) |
| Defendant. | ) |

Plaintiff Kimberly Maria Myles filed this *pro se* lawsuit against her former employer, Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), alleging she experienced employment discrimination during her time working for Defendant. Defendant moves for summary judgment on all claims.

I.   BACKGROUND

*A. Factual Background*[1]

1. Job Performance

Myles is an African-American woman born in 1962. She has worked three separate stints with Wells Fargo and each time she has voluntarily resigned her position with the company. [ECF

---

[1] The facts in this Section are drawn from the parties' Statement of Undisputed Material Facts and the appendices submitted in support. Any statement of material fact is deemed admitted unless the resisting party responds to that statement with an appropriate citation to the summary judgment record. *See* LR 56(b) ("The failure to respond to an individual statement of material fact, with appropriate appendix citations, may constitute an admission of that fact.").

Here, Myles failed to respond to any statement of fact in Defendant's Statement of Undisputed Material Facts. Rather, Myles filed a Resistance consisting of 28 unauthenticated exhibits, printed court opinions, and a one-page document asserting that "evidence is sufficient to bypass defendant's attempt to conceal pretext disparate treatment" and asserting that a reasonable mind would infer racial discrimination. *See* [ECF Nos. 53-1–53-3]. Accordingly, the Court treats each of these facts as admitted. *See* LR 56(b).

No. 40-2 ¶¶ 6–13; 92]. In her third and final stint with Wells Fargo, Myles worked as a Legal Process Specialist I ("LPS"). *Id.* ¶ 15. This position began on December 30, 2013. *Id.* Myles's supervisor for this position was Jennifer Hays (formerly Jennifer Merical) who interviewed and hired her. *Id.* ¶¶ 6–14; 16.

Hays conducted an annual performance review with Myles in March 2015. *Id.* ¶ 16. Myles received a "meeting expectations" rating in all of the performance categories for the previous year, but Hays advised her that she needed to improve her email management to keep a timely pace going forward.[2] *Id.* ¶¶ 21–22. The record reflects that Hays reiterated this direction regarding her email response rate in multiple one-on-one sessions with Myles. *Id.* ¶ 23. Hays received more complaints about Myles's response rate than any other LPS under her supervision. *Id.* ¶ 26.

In January 2016, Hays provided Myles with a Performance Improvement Plan (PIP) delineating how Myles's email management and her maintenance of case files needed improvement. *Id.* ¶ 29. Myles conceded in her deposition that she had issues with "file setup." *Id.* ¶ 30. Her job performance improved shortly thereafter, leading Hays to designate the PIP as "completed." *Id.* ¶ 38.

Hays avers that soon after the PIP was completed, Myles's performance regressed and she began to receive escalations from outside counsel again, claiming to not have received information or documents from Myles. [ECF No. 41 at 42] (Hays Decl.) (sealed). Hays observed cases that had not been updated since Myles completed her PIP. *Id.* This led to Hays issuing a "Formal

---

[2] Hays submitted a declaration in which she attests that she did not have access to the email inbox for Myles, or any other LPS's under her supervision, so she could not ascertain Myles's response rate easily. [ECF No. 41 at 41] (Hays Decl.) (sealed). She was apprised of the issues with the response rate from escalations form outside counsel about emails that were routed to Myles. *Id.*

Warning" for performance to Myles on April 29, 2016. *Id*. This warning described specific examples of poor email management and failure to maintain case files. *Id*. Myles did not dispute she was not in compliance with the case update requirements but asserts other LPSs were also non-compliant. [ECF No. 40-4 at 22].

### 2. Diversity Committee Participation

In 2016, Myles volunteered to participate as a member of a diversity and inclusion committee at Wells Fargo. [ECF No. 40-2 ¶ 50]. During a meeting on June 2, 2016, members of the committee were discussing personal recollections of the aftermath of the terrorist attacks on September 11, 2001. *Id*. ¶ 52. After one committee member recounted being subject to harassment following the attacks, Myles shared with the committee that she had worked at a hardware store during this time period and she occasionally encountered individuals at the store who had accents and other cultural signifiers which made Myles "afraid" of them. *Id*. ¶ 54. She commented that it may have been safer if these individuals did not wear certain head attire. *Id*. ¶ 55. This remark by Myles made another committee member upset and the incident was reported to Hays. *Id*. ¶¶ 56–57. Myles was removed from the committee shortly thereafter. *Id*. ¶ 58. Myles did not receive additional compensation or benefits as a result of participation on the committee and it was not mentioned in any of her subsequent job performance evaluations. *Id*. ¶¶ 51, 59.

### 3. Paralegal Positions

Myles asserts that between April 2016 and the date of her resignation in April 2018, she applied for multiple paralegal positions within Wells Fargo. *Id*. ¶ 60. These positions were designated as a Paralegal 2, which required three years of paralegal experience for eligibility. *Id*. ¶ 63. The resumes that Myles submitted for those jobs did not reflect any explicit paralegal experience. *See, e.g.*, [ECF No. 40-20 at 1–8]. Her professional experience included her positions

at Wells Fargo as an LPS, multiple customer service jobs within legal organizations, a legal secretary position, and a legal assistant role. *Id*. at 1–2. In her deposition, Myles insisted that her legal assistant positions were synonymous with the duties of a paralegal and it was only a matter of nomenclature. *Id*. at 27. A recruiter for Wells Fargo ultimately screened out Myles's application each time due to a lack of experience and qualifications commensurate with the job requirements. [ECF No. 40-2 at 11]. The selected candidates for each of the three positions had prior paralegal experience ranging from three years to thirty-four years. *Id*. ¶¶ 71–73. None of the application materials provided to the recruiter disclosed the race or age of the applicants. *Id*. ¶ 65.

Another paralegal position opened in late December 2016 for which Myles alleges she should have been considered. This was a Paralegal 1 position and Myles alleges it was not posted for all applicants but was just awarded to a younger white male with whom she worked. *Id*. ¶¶ 74–75. Myles does not know the job posting number but Wells Fargo's records reflect that a Paralegal 1 position was in fact posted in December 2016, attracting 100 job applicants. *Id*. ¶¶ 77–78. There is no record of Myles applying for this position.

4. Spying Allegations

On January 27, 2017, Myles filed a charge of discrimination against Wells Fargo with the Des Moines Civil and Human Rights Commission alleging racial discrimination. She added an amendment to her complaint in May 2018, asserting retaliation because she says she was being harassed by Wells Fargo "to all extremes" in her personal and working life. [ECF No. 40-29]. The amendment does not provide details of the harassment but Myles had previously submitted an internal complaint to Wells Fargo's human resources department alleging harassment and stalking by other employees. [ECF No. 40-2 ¶ 82]. Myles contends that this harassment was initiated and

perpetrated by Hays and "her cohorts." *Id*. ¶ 84. She identifies three incidents where she was "stalked" by individuals associated with Wells Fargo to out-of-state family funerals.

The first incident consisted of a man, whom she described as having a disheveled look, requesting to use her phone "to talk about [his] job."[3] [ECF No. 40-4 at 29]. Myles says she was suspicion because the man "tried to have this 'I'm homeless' look" but his look was not consistent with the homeless individuals she encountered when she lived in Philadelphia. *Id*. She thus interpreted the "job" comment from the man as a clandestine way to relay the message "this is your job bothering you." *Id*. at 30. Myles thought this to be "code talk" because she had just received a 30-day warning from Hays.

A second incident of alleged stalking by Wells Fargo occurred in Arizona. Myles testified that a few days prior to her trip, she had learned that another co-worker made significantly more money than her. *Id*. While in Arizona, she shared her displeasure about the ostensible pay discrepancy with her friends at a restaurant. Sitting near Myles and the rest of her group at the restaurant was a woman who Myles testified would regularly leave her purse at the table while she retrieved food from a salad bar. *Id*. This was suspicious to Myles and the others because of the risk that her purse may be stolen. Her purse was apparently within earshot of Myles's group while she complained about her pay. Myles said she did not think this was particularly odd behavior on the part of the woman until she returned to Wells Fargo after her trip. A few weeks after she returned, everyone in her department learned they were getting pay raises. Myles suspects that the woman had been surreptitiously recording her conversation with a cell phone inside her purse. She alleges the company decided to give across-the-board pay raises to everyone in her department "to

---

[3] Myles's statement at her deposition was that the man told her "I want to talk about my job." Given the context—Myles describes this as "code talking"—it appears that the "my" is a direct quote from the man to his own job. [ECF No. 40-4 at 29].

make it appear that they are not singling me out." *Id*. Wells Fargo's concern about singling her out, according to Myles, is because she had made it known to some of her co-workers that she was going to proceed with filing a discrimination complaint against the company.

The third out-of-state incident purportedly took place in Denver. Myles stated she had consensual sex with a man who covertly video recorded the encounter. *Id*. at 31. Her theory is that the man had connections to Wells Fargo and was upset that she did not inform him that she was suing the company. *Id*. Therefore, he recorded and distributed their sexual encounter while repeatedly telling Myles that he was going to "keep you from getting that money," referring to possible damages she would receive as a result of this lawsuit. *Id*. She does not explain why she believes the man is connected to Wells Fargo but posits that he was an "instrument" for Wells Fargo to bring her down and "break" her. *Id*.

Beyond these stalking incidents, Myles also claims Wells Fargo engaged in harassment against her by collaborating with a "known slumlord" to install video surveillance of her residence across the street. [ECF No. 40-2 ¶ 89]. This supposition is based on a high-tech video surveillance camera that was erected across the street from her home shortly after she refused to sign a final written warning issued by Hays. Myles concluded that Wells Fargo was responsible for the presence of the camera based on the temporal proximity to her refusal to sign the final warning, the atypical and apparent non-commercial character of the camera, and her discovery that the landlord had recently joined a "landlord association" which led to an inference that certain members of Wells Fargo management "most likely ha[ve] a relationship with this slum landlord." *Id*. ¶ 90.

After her resignation, Myles alleges that she was approached by a Wells Fargo employee who told her that the company "is spending an awful lot of money and they are spending it to

stalk" Myles. *Id*. ¶ 93. When she was further pressed at her deposition, Myles again asserted the individual told her in "code" and she was able to infer the rest. *Id*. ¶ 95.

### B. *Procedural Background*

Myles originally filed a three-count petition in the Iowa District Court for Polk County alleging employment discrimination based on her race and age. [ECF No. 1-1 at 4–5]. She also alleges retaliation after she filed a discrimination charge with the Des Moines Civil and Human Rights Commission in February 2017. The discrimination charge was transferred to the Iowa Civil Rights Commission ("ICRC") at Myles's request, and the agency issued a right to sue letter on July 23, 2020. *Id*. at 5; 9. Two individual plaintiffs were named, in addition to Wells Fargo, but Myles agreed to dismiss them from the case.

Wells Fargo removed the suit to this Court based on diversity jurisdiction on May 27, 2021. [ECF No. 1]. Myles moved to remand the case back to state court but the Court denied her motion, adopting a Report and Recommendation from United States Chief Magistrate Judge Helen C. Adams.[4] [ECF Nos. 16; 17].

The case has proceeded through discovery and now Wells Fargo moves for summary judgment in its favor. [ECF No. 40]. It asserts that Myles's claims fail as a matter of law. Myles resists the Motion. [ECF No. 51].

## II.   ANALYSIS

### A. *Summary Judgment Standard*

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

---

[4] The Court also adopted Judge Adams's recommendation to deny Myles leave to amend her complaint to add the City of Des Moines as a defendant based on futility. The asserted claims would be time-barred. [ECF No. 17 at 3–4].

P. 56(a); *Paulino v. Chartis Claims, Inc.*, 774 F.3d 1161, 1163 (8th Cir. 2014). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)).

To preclude the entry of summary judgment, a plaintiff must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The evidence is viewed "in the light most favorable to the nonmoving party," which includes drawing all reasonable inferences in that party's favor. *Bio-Med. Applications of Minn.*, 775 F.3d at 1053 (quoting *Johnson v. Wells Fargo Bank, N.A.*, 744 F.3d 539, 541 (8th Cir. 2014)). But "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson*, 477 U.S. at 255. "Generally, the issue of whether a particular intent existed is a question of fact for the jury." *Yellen v. Hake*, 437 F. Supp. 2d 941, 952 (S.D. Iowa 2006) (quoting *In re K-tel Intern., Inc. Sec. Litig.,* 300 F.3d 881, 894 (8th Cir. 2002)).

### B. Myles's Claims

Myles brings two causes of action. Her first claim is that she was subjected to illegal racial and age discrimination stemming from: (1) the formal warning issued by Hays on April 29, 2016; (2) removal from the diversity and inclusion committee; and (3) the failure to hire her for the paralegal positions for which she applied. Myles's second claim is that she was harassed and retaliated against for her complaints during her employment.

1.  Employment Discrimination Claim

Myles does not identify any direct evidence of racial or age discrimination for any of the complained of employment actions. In the absence of direct evidence of discrimination, courts apply the burden-shifting analysis from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir. 2007) (applying the burden shifting framework to age discrimination claims).

To establish a *prima facie* case of employment discrimination, Myles must initially show: (1) she is a member of a protected class; (2) she was meeting the legitimate job expectations of Wells Fargo; (3) she suffered a materially adverse employment action; and (4) similarly situated employees outside of her protected class were treated differently. *Id*. at 802–03. If Myles can successfully establish a *prima facie* case, the burden shifts to Defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 937 (8th Cir. 2019). If Defendant meets its burden, Myles must then show that the proffered nondiscriminatory reasons are a pretext for intentional discrimination. *Id*.

Myles cannot satisfy the initial burden for any of her claims. As to her final warning claim, evidence in the summary judgment record, deemed admitted due to Myles's failure to respond, indicates that she was not performing her job satisfactorily. She was not managing her emails in a timely fashion and she received several written notices of the issue. The record indicates that Hays received numerous complaints from outside counsel regarding cases to which Myles was assigned. Myles also did not update her case status reports in a timeframe under which Wells Fargo could reasonably expect. Notwithstanding that Myles disputes the accuracy of the assessments, she is unable to marshal any evidence that other comparators were treated differently. *See Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012) (finding that "[t]he test for

determining whether employees are similarly situated to a plaintiff is a rigorous one."). Defendant identifies a comparator who was subject to similar discipline around the same time period, who did not share Myles's protected status for race or age. [ECF No. 40-2 ¶¶ 34–36]. The evidence cannot support that the performance issues identified by Wells Fargo is merely a pretext for racial and age discrimination.

To qualify as an adverse employment action, "the action must have some adverse impact" on the employee. *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997). There is no evidence that her removal from the diversity committee changed the terms or conditions of her employment. Myles acknowledges that the committee was voluntary and concedes she received no benefit or compensation from her participation on it. There was "no termination, cut in pay or benefits, or changed job duties or responsibilities." *Jackman v. Fifth Jud. Dist. Dep't. of Corr. Servs.*, 728 F.3d 800, 805 (8th Cir. 2013). Removal from the diversity and inclusion committee did not constitute an adverse employment action.

And finally, Myles cannot establish a *prima facie* case of employment discrimination, based on race or age, based on Wells Fargo's failure to hire her for various paralegal positions to which she applied. A failure-to-promote *prima facie* case requires that Myles establish that (1) she is a member of a protected group; (2) she applied for a promotion to an available position for which she was qualified; (3) she was rejected; and (4) similarly situated employees who are not members of the protected class were promoted instead. *Younts v. Fremont Cnty., Iowa*, 370 F.3d 748, 754 (8th Cir. 2004). The evidence clearly shows that Myles applied to three Paralegal 2 positions, a position which requires a minimum of three years of experience as a paralegal. Myles's resume does not identify any previous work experience as a paralegal. The individuals who were hired for the three open paralegal positions had between 3 and 34 years of paralegal experience. Myles's

assertion that her experience as a "legal assistant" was sufficient qualification is not enough to establish that she was qualified for the position. Her contention that a Paralegal 1 position, which she may have been qualified for, was "given" to a white man is inconsistent with the summary judgment record. Wells Fargo's records indicate that the position was posted and over 100 individuals applied. Myles was not one of them. This is fatal to her failure-to-promote claim for that position. *See Gentry v. Georgia–Pacific Corp.,* 250 F.3d 646, 650 (8th Cir. 2001).

### 2. Retaliation Claim

Myles also brings a claim for retaliation. It is unclear if she engaged in any protected conduct beyond her filing of an administrative complaint with the Des Moines Civil and Human Rights Commission. The *McDonnell Douglas* burden-shifting framework similarly applies to any retaliation claim. To establish a *prima facie* case for retaliation, Myles must show (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. *Gilbert v. Des Moines Area Cmty. Coll.,* 495 F.3d 906, 917 (8th Cir. 2007).

Myles does not state the basis for her retaliation claim in her Complaint or ICRC complaint, but she explained at her deposition that the retaliation manifested through the stalking and surveillance allegations described above and a meeting between Myles, Hays, and Hays's manager where Myles claims that Hays "lunged" at her. These allegations, particularly the stalking and surveillance allegations have no evidence to support them in the record beyond Myles's deposition testimony. While the Court must draw all reasonable inferences from the factual record in favor of the non-moving party, it is not required to accept as true statements that are entirely speculative, implausible, and unsupported by the summary judgment record.

### III. CONCLUSION

Based on the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. [ECF No. 40].

IT IS SO ORDERED.

Dated this 8th day of July, 2022.

                                                  STEPHANIE M. ROSE, CHIEF JUDGE
                                                  UNITED STATES DISTRICT COURT